IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JUNIOR A. SOBRINO-BARRERA,           §
                                     §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §        CIVIL ACTION NO. H-09-3642
                                     §
ANDERSON SHIPPING CO., LTD.,         §
SOCOGEM SAM, and OLDENDORFF          §
CARRIERS GMBH & CO. KG,              §
                                     §
        Defendants.                  §

MEMORANDUM AND ORDER

_____Pending are Defendants Anderson Shipping Co., Ltd.'s and SoCoGEM SAM's Motion for Summary Judgment (Document No. 55) and Motion to Strike Affidavit of Captain Joe Grace (Document No. 61), and Defendant Oldendorff Carriers GmbH & Co. KG's Motion for Summary Judgment (Document No. 56) and Motion to Strike Affidavit of Captain Joe Grace (Document No. 63). After having reviewed the motions, responses, replies, and applicable law, the Court concludes for the reasons that follow that Defendants' motions for summary judgment should be granted.

I. Background

Plaintiff Junior A. Sobrino-Barrera ("Plaintiff") brings this longshoreman's personal injury claim under section 905(b) of the Longshore Harbor Worker's Compensation Act ("LHWCA"), 33 U.S.C.

§ 905(b).  Plaintiff was employed by stevedoring company Gulf Stream Marine and served as the gang supervisor on March 27, 2008, when he and his gang, which included Jose Segura ("Segura"), Daniel Santa Cruz La Rosa ("La Rosa"), and two others, began unloading bundled steel pipes from the M/V GRETA, which had docked at the Greensport Terminal in Houston the day before.[1]  The pipes were stowed fore and aft in the aft section of the hold, near the bulkhead, and spanned the width of the hold.[2]  Plaintiff observed that the pipes had been loaded into the hold in an uneven manner, such that there was a "peak" or "hill" in the cargo.[3]  The uncontroverted evidence is that Plaintiff had seen pipes stacked like this before, and Plaintiff as gang supervisor formulated the plan for their discharge without assistance from anyone else. Plaintiff decided to begin the discharge process by leveling out the highest part of the "hill" of pipes by first lifting those

---

[1] Document No. 1 at 4 (Orig. Complt.).  The cargo of steel pipes and coils had been stowed on the M/V GRETA by a stevedoring company at the port of Mumbai, India.  *See* Document No. 55 at 4. The pipes were approximately forty feet long and 4" to 7" in diameter and were bundled in sets with seven to eight pipes in each bundle, although there were also some loose pipes.  Document No. 59, ex. A at 168: 20-21; id., ex. E-2 at 2.  A load may consist of 4 or 5 bundles of pipe at a time.  Id., ex. E-2 at 3.

[2] Document No. 55, ex. K at App. 000266 (SeaTech Surveyor Report) ("The Casing Seamless Steel Pipes bundles and Loose Pipes for discharge at Houston were stowed fore & aft longitudinally in a single row from side to side.").

[3] Document No. 59, ex. A at 153:9-14 (Sobrino-Barrera Depo.).

2

highest on the stack, and he and his gang, according to LaRosa and Segura, successfully discharged two or three loads of pipe.[4]

On each load, Plaintiff and his gang would secure a wire sling under the forward end of the bundles of pipe, signal the crane operator to lift it in order for the gang to place bands under the forward end, and signal the crane to lower the bundle.[5] This same procedure was used to attach the aft part of the bundle, which then enabled the crane to lift the load out of the hold.[6] According to Plaintiff, when the crane lowered the second or third load onto the existing hill of pipe after the forward section was secured with the wire sling, one bundle rolled out from under the load and rolled toward Plaintiff, who was standing near the forward port corner of the stack.[7] Plaintiff attempted to jump out of the way of the oncoming pipe, but was able to get only his right leg free before the rolling bundle pinned his left leg against the wall of the hold, crushing it.[8] Plaintiff's left leg ultimately had to be amputated below the knee.[9]

---

[4] Document No. 59, ex. C at 10; ex. B at 15.

[5] Id., ex. A at 87:9-20; id., ex. E-2 at 2.

[6] Id., ex. A at 87:9-20; id., ex. E-2 at 2.

[7] Document No. 59, ex. A at 154:1-20, 175:5-25 (Plaintiff Depo.).

[8] Id., ex. A at 154:11-14.

[9] Document No. 1 at 4.

II.   Summary Judgment Standard

Rule 56(a) provides that summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party must "demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted.  Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.  Id.  "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."  Id.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact."  FED. R. CIV. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Id. 56(c)(3).

4

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

## III.  Discussion

## A.  Plaintiff's Late-Produced Supplemental Expert Report

Defendants move to strike the June 10, 2011 affidavit of Captain Joe Grace ("Grace"), Plaintiff's expert.[10] They assert the affidavit either is an untimely supplemental report or is irrelevant. *See* FED. R. CIV. P. 26(a)(2)(B). The enlarged cut-off

---

[10] *See* Document No. 61 at 2-5; Document No. 63 at 1-4.

date for Plaintiff to submit expert reports (other than economists) was February 25, 2011, and the cut-off date for all discovery was April 22, 2011.  Plaintiff replies that the June 10th affidavit is not a supplemental report but rather is submitted to authenticate its expert's timely-filed original report, dated February 15, 2011.

Rule 37(c)(1) provides that a party who fails to disclose documents in accordance with Rule 26 "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1); *see also* <u>Tex. A&M Research Found. v. Magna Transp., Inc.</u>, 338 F.3d 394, 402 (5th Cir. 2003) (noting four factors in determining whether a violation of Rule 26 was harmless, including the importance of the evidence, the prejudice to the opposing party, and the explanation given by the party seeking to introduce the evidence).

Courts routinely reject untimely "supplemental" expert testimony where the opinions are based upon information available prior to the deadline for expert disclosures. *See* <u>Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.</u>, 73 F.3d 546, 572-73 (5th Cir. 1996) (disallowing expert testimony where party disclosed the information late and did not give a persuasive reason for its failure to comply with discovery order); <u>Avance v. Kerr-McGee Chem., LLC</u>, No. 5:04CV209, 2006 WL 3484246, at *7 (E.D. Tex. Nov. 30, 2006) (striking an expert affidavit which was submitted to

rebut a summary judgment motion when affidavit contained new opinions that were different from the earlier Rule 26 report and plaintiffs did not demonstrate "substantial justification" for failing to file the opinions timely); Cleave v. Renal Care Grp., Inc., No. Civ. A. 2:04CV161-P-A, 2005 WL 1629750, at *1 (N.D. Miss. July 11, 2005) ("A new expert affidavit which is submitted to rebut a summary judgment motion should be stricken if the new opinions differ from the earlier Rule 26 report." (citation omitted)).

A comparison of Grace's affidavit to his February 15, 2011 report discloses that he departs from and expands upon his original report in numerous material respects. For example, Grace for the first time renders an opinion that stowing pipe "hard aft to the bulkhead" is an abnormal practice, from which he further opines that a stevedore in Houston would not expect or recognize such as an abnormal and unsafe practice.[11] Also, Grace opines that the position of the pipe that injured Plaintiff relative to the aft bulkhead was not "open and obvious" to Plaintiff because it was underneath another pipe, which is a new conclusion.[12] Grace newly opines that pipe stowed "hard aft" to the bulkhead is "much more likely, almost certain," to shift diagonally during the unloading process, a putative quantification of risk not contained in his

---

[11] Cf. Document No. 59, ex. E at 5 with Document No. 59, ex. E-2.

[12] See Document No. 59, ex. E at 4, 5.

7

original report.[13]   Additionally, for the first time he claims that

his report, evidently referring to his original report as well, is

the "product of reliable principles and standards generally

accepted and utilized by experts," which he recites under the sub-

title of "methodology," but without detailing any methodology,

principles, or standards.   As these and other assertions and

opinions are new, and Plaintiff has given no explanation for his

failure to comply with Rule 26(a) or shown that their addition

would be "justified and harmless," the Affidavit is STRICKEN and

will not be considered by the Court, except for what Plaintiff

describes as its primary purpose, namely, to "prove[] up the

[original] expert report of Captain Grace."   Cleave, 2005 WL

1629750, at *1.


B.   Vessel Liability under Section 905(b)

    Plaintiff seeks recovery from Defendants Anderson Shipping

Co., Ltd., SoCoGEM SAM (together, "Anderson"), and Oldendorff

Carriers GmbH & Co. ("Oldendorff"),[14] alleging that they breached

---

    [13] Id. at 5.

    [14] Anderson Shipping Co., Ltd. is the owner of the M/V GRETA,
and SoCoGEM Sam is the vessel's technical manager or operator. See
Document No. 55 at 1 n.1; Document No. 56 at 1. Oldendorff Carriers
GmbH & Co. K.G. was the vessel sub-charterer. See Document No. 56
at 1.  Section 902(21) of the LHWCA defines the term "vessel" to
include vessel owners, operators, and charterers.   33 U.S.C.
§ 902(21).  Accordingly, all of the named defendants are subject to
section 905(b).  For simplicity, the term "vessel" will be used to
refer to all Defendants when discussing the duties owed to a
longshoreman under section 905(b).

the duties owed to him under section 905(b) of the LHWCA.[15]  *See* Scindia Steam Nav. Co., Ltd. v. De Los Santos, 101 S. Ct. 1614 (1981).   Section 905(b) gives a longshore worker the right to recover damages from a vessel for injuries "caused by the negligence of a vessel."  *See* 33 U.S.C. § 905(b).  The potential negligence of a vessel under section 905(b) of the LHWCA  has been defined in terms of the breach of any of three duties, commonly called the "Scindia" duties: (1) the "turnover duty," which applies if the vessel fails to turn over a reasonably safe ship or, on turning over the ship, fails to warn of hidden defects of which it knew or should have known; (2) the "active control duty," which applies if the vessel fails to remedy hazards under the active control of the vessel; and (3) the "duty to intervene," which applies if the vessel fails to intervene in the stevedore's operations when it has actual knowledge of the hazard and when the stevedore, in the exercise of obviously improvident judgment, means to work on in the face of the hazard and therefore cannot be relied on to remedy it.  Howlett v. Birkdale Shipping Co., S.A., 114 S. Ct. 2057, 2063 (1994) (citing Scindia, 101 S. Ct. at 1622-23).

---

[15] Document No. 1 at 5-6.

1.  <u>Turnover Duty</u>

The "turnover duty" implicates two responsibilities of the vessel: (1) to exercise ordinary care under the circumstances to turn over the ship and its equipment in such a condition that an expert stevedore can carry on cargo operations with reasonable safety; and (2) to warn the stevedore of latent defects known (or that should have been known) to the vessel.  <u>Id.</u> at 2064.  The turnover duty does not include dangers that are (1) open and obvious; or (2) something a reasonably competent stevedore should anticipate encountering.  <u>Id.</u>  The plaintiff bears the burden of proving that the hazard could not have been anticipated by the stevedore.  <u>Id.</u> at 2067 ("[Plaintiff] must further demonstrate that the alleged hazard would have been neither obvious to nor anticipated by a skilled and competent stevedore at the discharge port.").  If the defect in the cargo stow is open and obvious to the stevedore, the vessel has no liability for breach of either the turnover duty to warn or to furnish a reasonably safe ship.  <u>Kirksey v. Tonghai Maritime</u>, 535 F.3d 388, 397 (5th Cir. 2008); <u>Greenwood v. Societe Francaise De</u>, 111 F.3d 1239, 1246-47 (5th Cir. 1997) (reversing judgment for stevedore and holding that the defect in the slewing brake of the crane was open and obvious because the crane operator testified that he could tell that there was something wrong with the braking mechanism "as soon as he began operating the crane"); <u>Pimental v. LTD Canadian Pac. Bul</u>, 965 F.2d

10

13, 16 (5th Cir. 1992) (holding that the greasy passageway was open and obvious to a stevedore because two crane operators testified that the oil and grease were open and obvious to them).

The facts on summary judgment in this case bear a striking similarity to those upon which summary judgment was granted for the defendants in Clay v. Daiichi Shipping, 74 F. Supp. 2d 665 (E.D. La. 1999), affirmed by the Fifth Circuit in an unpublished opinion "for essentially the reasons stated by the district court in its Order and Reasons." Clay v. Daiichi Chhuo Shipping (America) Inc., 2000 WL 1701761 (5th Cir. 2000). In Clay, the plaintiff was a longshoreman removing loose steel pipes from the No. 1 Hold in a vessel at the Port of New Orleans. 74 F. Supp. 2d at 667. Some or all of the pipes were stowed against the ship's bulkhead and had to be "broken out" to be discharged. While lifting a loose pipe in order to place a pipe hook in the lower end, the pipe hook slipped out of the pipe end, allowing the pipe to roll toward the plaintiff, amputating his left leg. The plaintiff maintained that the stowage of the steel pipes against the bulkhead constituted an unreasonably dangerous condition preventing discharge of the pipe with reasonable safety, and sought to hold the vessel and its owner responsible based on breach of the turnover duty, the active control duty, and the duty to intervene. The trial court found that the position of the pipes against the bulkhead "was an open and obvious condition and defendants did not breach their turnover

11

duty." <u>Clay</u>, 74 F. Supp. 2d at 673.  Indeed, up until the time of
the accident-- just as in the instant case--there was no evidence
that the longshoreman had made any complaint about the stowage of
the cargo.  Moreover, the plaintiff in <u>Clay</u>, as here, failed to
produce evidence that the conditions that caused the harm "were any
less obvious to the vessel than to the longshoremen, or that the
conditions were otherwise hidden or latent." <u>Id.</u> at 673.  Judge
Eldon E. Fallon carefully reviewed the United States Supreme Court
decisions in <u>Howlett</u> and <u>Riggs</u>, and reached a conclusion that the
Fifth Circuit recently quoted with approval <u>Kirksey v. Tonghai
Maritime</u>, as follows:

> A fair reading of these opinions compels the conclusion
> that the open and obvious defense is applicable to the
> turnover duty to provide a safe vessel and that a vessel
> owner has no legal duty to prevent or alleviate an unsafe
> condition in the cargo hold resulting from an improper
> stow when the condition is open and obvious to the
> longshore workers.  While this result seems harsh, it is
> motivated by the conviction that a contrary result would
> put all costs on the party who is least able to avoid the
> accident: the vessel.  More importantly, it is believed
> that imposing liability on the vessel owner would
> completely remove the incentive to act with caution from
> the party who is in the best position to avoid accidents:
> the stevedore.

535 F.3d 388, 395 (5th Cir. 2008)(quoting <u>Clay</u>, 74 F. Supp. 2d at
671).

The Fifth Circuit's decision in <u>Kirksey</u> is also close in
point.  In <u>Kirksey</u>, the district court at trial had found that the
"overwhelming proximate cause" of the stevedore's loss of a leg and

other serious injuries was "the dangerous condition of the
stow--the leaning coils, the inadequate dunnage, the lack of
uniformity in the stow," and adjudged liability against the vessel
owner/operator and the charterer of the vessel. Kirksey, 535 F.3d
at 391. The Fifth Circuit found that the record supported the
district court's version of the accident, but reversed and rendered
judgment in favor of the defendants, holding that because "the
defect in the cargo stow found by the district court was open and
obvious to the stevedore, the vessel had no turnover duty to warn
against the defect or to correct the unsafe condition." Id. at
397.

    So it is here. Plaintiff contends that there were defects in
the stow that constituted unreasonably dangerous conditions:
(1) drop stowage of the pipes that created unevenness and a "hill"
in the cargo; (2) inadequate dunnage; and (3) stowage of the steel
pipes against the bulkhead. Because Plaintiff fails to raise a
fact issue that any of these defects in the stowage was not "an
open and obvious condition and one that a reasonable longshoreman
should have seen," the Court finds no liability under the turnover
duty. Greenwood, 111 F.3d at 1246.

    First, the drop stowage of the pipes that created the hill in
the cargo was open and obvious. Plaintiff and two other
longshoremen who were in the hold on the day of the accident all
testified that the uneven stowage of the pipes was readily apparent

to all of them before they started working.[16]  Defendants owed no duty to Plaintiff regarding this open and obvious condition.  *See* Greenwood, 111 F.3d at 1246; Kirksey, 535 F.3d 392.

Likewise, the summary judgment record reveals that Plaintiff was aware of the lack of dunnage, or wood, in the stowage. Plaintiff testified that from the start he noticed that there was no dunnage and no cables lashing the pipes together: "[W]hen I started at the hold, there was nothing, neither wood or anything tied."[17]  La Rosa likewise testified that there was no dunnage separating the pipe before they lifted it.[18]  The lack of dunnage separating the pipes was an open and obvious condition.  *See* Greenwood, 111 F.3d 1246; Clay, 74 F. Supp. 2d at 672.

Third, the stowage of the pipes against the bulkhead was also open and obvious.  Plaintiff saw the configuration of the pipes from above the cargo hold before entering it.[19]  Indeed, Plaintiff testified that, as the gang supervisor, it was his job to assess the situation with the stowage of the pipes in order to formulate a plan for the safe discharge of the bundles from the vessel, and

---

[16] *See* Document No. 59, ex. A at 97:6-99:7 (Plaintiff Depo.); id., ex. B at 24:18-25:9 (Segura Depo.); id., ex. C at 15:9-15 (La Rosa Depo.).

[17] *See* id., ex. A at 119:17-19; *see also* id., ex. A at 123:7-11, 125:6-7.

[18] Id., ex. C at 15:16-20.

[19] *See* Document No. 59, ex. A at 120:23-24 ("We take a look at the hold.  From the top we look down, and then we start coming down the stairs.").

that he indeed did so.[20]  He testified that the first thing he did was to "check the cargo and see how it is."[21]  Moreover, the photographs taken from above the hold before unloading show that the pipes were stowed in the aft section of the hold in proximity to the bulkhead.[22]  *See, e.g.,* Kirksey, 535 F.3d at 391 (referring to photographs taken before the unloading operations began as indication that the stowage was improper).  When Plaintiff and others in his gang descended into the hold and were standing on the pipes, and when they began placing wire slings/breakout wires under the forward and the aft ends of the bundles first to be removed, they necessarily saw the proximity of the pipe to the bulkhead.  In fact, they used the bulkhead to their advantage.  Longshoreman Segura, working under Plaintiff's supervision, testified that they first lifted the forward end of the pipes because the bulkhead would provide a backstop to prevent pipes from sliding.[23]  On this summary judgment record, the Court finds, as did Judge Fallon in Clay, "the position of the pipes against the bulkhead was an open and obvious condition and defendants did not breach their turnover duty."  Clay, 74 F. Supp. 2d at 673.

---

[20] See id., ex. A at 98:2-99:18.

[21] *See* id., ex. A at 130:10.

[22] *See* id., ex. E-3 at OLD-00319.

[23] *See* Document No. 59, ex. B at 34:8-12.

15

In sum, there is no summary judgment evidence that the ascribed defects in the stow, the "hill" or "peak" in the stow of the pipes, the absence or inadequacy of dunnage, or the proximity of the pipes against the bulkhead, were not open and obvious conditions.[24]  Moreover, there is no summary judgment evidence that the hazards associated with the claimed defects in the stow should not have been anticipated by a skilled and competent stevedore, or that the vessel had any superior knowledge to that of a skilled and competent stevedore about the stow or its hazards.  Accordingly, "the vessel had no turnover duty to warn against the defect or to correct the unsafe condition."  <u>Kirksey</u>, 535 F.3d at 397.

---

[24] Plaintiff's expert Captain Grace in his Report described these defects in stowage as the pipes being "peaked up," improper dunnage, and stowage "hard to aft in bulkhead."  Document No. 59, ex. E-2 at 3-4.  His conclusion, however, is that such "improper stowage . . . is the responsibility of the Master of the vessel and/or charterers and therefore negligence on the part of defendants."  <u>Id.</u>  As observed above, given that these alleged defects in the stowage were open and obvious, as a matter of law there is no breach of the vessel's turnover duty, and no negligence on the part of Defendants for which they can be held liable under section 905(b).  "We have repeatedly held that [Rule 704(a)] does not allow an expert to render conclusions of law."  <u>Snap-Drape, Inc. v. C.I.R.</u>, 98 F.3d 194, 198 (5th Cir. 1996); <i>see also</i>, <u>Goodman v. Harris County</u>, 571 F.3d 388, 399 (5th Cir. 2009) ("[A]n expert may never render conclusions of law."); <u>Owen v. Kerr-McGee Corp.</u>, 698 F.2d 236, 240 (5th Cir. 1983) ("[A]llowing an expert to give his opinion on legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.").  Captain Grace's opinion that the vessel was negligent raises no genuine issue of material fact.

2.  Active Control Duty

The second Scindia duty requires that a vessel exercise reasonable care over the areas of the vessel that remain under its active control.  101 S. Ct. at 1622.  "A vessel owner has 'active control' over an area of the ship and retains primary responsibility for the safety of workers in that area if: (1) the vessel's crew retained substantial control over the area; or (2) the vessel's crew substantially interfered, by invitation or otherwise, with the contractor's exercise of exclusive control by actively intervening in the area."  Gonzalez v. United States, 588 F. Supp. 2d 747, 754 (S.D. Tex. 2008) (Hanen, J.) (citing Davis v. Portline Transportes Mar. Internacional, 16 F.3d 532, 541 (3d Cir. 1994)); see also Manuel v. Cameron Offshore Boats, Inc., 103 F.3d 31, 34 (5th Cir. 1997) (no active control where there was no evidence that the vessel crew was active in the area where the stevedores were working).

Plaintiff maintains that Defendants breached this duty because the Master wanted the pipes stowed against the bulkhead, relying upon a "Final Cargo Plan," which bears the inscription, "Master wanted to load pipes against the aft bulkhead."[25]  As observed in

---

[25] Defendants curiously challenge the authenticity of this document, but it is included in what Anderson's attorney Richard L. Gorman authenticates in his Declaration as a "true and correct copy of the Loading Tally and Stowage Supervision Survey Report (Bates numbered OLD-00247-278) conducted on behalf of Charterer Oldendorff Carriers GmbH & Co."  Anderson's Motion for Summary Judgment

<u>Clay</u>, however, "[t]he vessel's role in dictating where the cargo will be stowed does not in itself justify imposing liability on the vessel owner." <u>Clay</u>, 74 F. Supp. 2d at 673 (citing <u>Howlett</u>, 114 S. Ct. at 2057). <u>Howlett</u> expressly recognized that "[m]ost vessels take responsibility, for instance, for preparing a stowage plan, which governs where each cargo will be stowed on the ship." <u>Howlett</u>, 114 S. Ct. at 2066. The Court continued:

> But it is the stevedore, an independent contractor hired for its expertise in the stowage and handling of cargo, that is charged with actual implementation of the plan. To impose a duty upon vessels to exercise scrutiny over a cargo loading operation to discover defects that may become hidden when the stow is complete would require vessels to inject themselves into matters beyond their ordinary province. . . . The proposed rule would undermine Congress' intent in § 5(b) to eliminate the vessel's nondelegable duty to protect longshoremen from the negligence of others. *See* <u>Scindia Steam</u>, 451 U.S., at 168-169, 101 S. Ct., at 1622-1623.

<u>Id.</u> (internal citations omitted); *see also* <u>Breaux v. United States</u>, No. 95-2924, 1996 WL 626328, at *4 (E.D. La. Oct. 23, 1996) (a prerequisite to vessel liability under the second <u>Scindia</u> duty is active control by the vessel over the actual methods and operative details of the longshoreman's work). Here, there is no summary judgment evidence that the Master took active control of the onloading process in Mumbai and directed the stevedore's actual implementation of the stowage plan.

_____

(Document No. 53, ex. L).

Not only is there no summary judgment evidence that the Master took operational control of the loading of the vessel, the summary judgment evidence is uncontroverted that the Master did not do so in offloading at the Port of Houston.  Plaintiff and longshoreman La Rosa both testified that the only people directing the discharge of the pipes that day were employees or representatives of Gulf Stream.[26]  Plaintiff further admitted in his deposition that "no one in the crew told [him] that [he] had to do this or that,"[27] and "[n]o one was telling [him] what [he] had to do" from the ship.[28]  On this record, the vessel did not have an active control duty to Plaintiff.  _See_ <u>Manuel</u>, 103 F.3d at 34 (vessel owner had no duty to remedy hazards arising from an area where the crew was not active and where it did not "retain[] operational control").

### 3. <u>Duty to Intervene</u>

Plaintiff contends that Defendants had a duty to intervene to prevent Plaintiff and the other longshoremen from engaging in an unreasonably dangerous job.  The <u>Scindia</u> "duty to intervene" imposes liability upon a vessel owner if the owner has "actual knowledge both of a hazardous condition _and_ that the stevedore, in

---

[26] Document No. 59, ex. A at 99:17, 113:17; <u>id.</u>, ex. C at 26:15-28:22.

[27] _See_ <u>id.</u>, ex. A at 99:17.

[28] _See_ <u>id.</u>, ex. A at 113:17.

the exercise of 'obviously improvident' judgment, intends to continue work in spite of that condition." Gay v. Barge 266, 915 F.2d 1007, 1012 (5th Cir. 1990) (emphasis in original). This duty "is narrow and requires 'something more' than mere shipowner knowledge of a dangerous condition." Singleton v. Guangzhou Ocean Shipping Co., 79 F.3d 26, 28 (5th Cir. 1996) (quoting Futo v. Lykes Bros. Steamship Co., 742 F.2d 209, 215 (5th Cir. 1984)). "[I]n order for the expert stevedore's judgment to appear 'obviously improvident,' that expert stevedore must use an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when the stevedore's expertise is taken into account." Greenwood, 111 F.3d at 1249 (citations omitted); see also Clay, 74 F. Supp. 2d at 674. Further, "[t]he shipowner, within limits, is entitled to rely on the stevedore, and owes no duty to the longshoreman to inspect or supervise the cargo operations." Scindia, 101 S. Ct. at 1624-25 (emphasis in original); Greenwood, 111 F.3d at 1249.

In Scindia, both the vessel and the stevedore knew that a winch used in the loading operations had malfunctioned on and off for two days prior to the longshoreman's injury. 101 S. Ct. at 1618. The vessel further knew that the stevedore intended to use, and did use, the defective winch even though its braking mechanism was faulty. Id. at 1626. The vessel did not intervene to stop operations or to fix the winch. Id. at 1618. On one of the loads,

the winch failed, causing sacks of wheat to fall on and injure the longshoreman. Id.  The Supreme Court held that if the stevedore's judgment was obviously improvident to the vessel, and the vessel, if it knew of the defect, should have realized that the condition presented an unreasonable risk, then the vessel had a duty to intervene to stop the loading operations and to fix the winch.  Id. at 1626.

Unlike Scindia, there is simply no evidence in this case that any of the vessel's crew knew that the stowage of the pipes created such an unreasonable risk to Plaintiff and his gang that the stevedores' commencement of offloading operations was "obviously improvident" in the face of danger.  *See* Clay, 74 F. Supp. 2d at 674 (finding that pipes stowed hard aft to the bulkhead did not present a condition that was so hazardous as to be "obviously improvident" such that the vessel had a duty to intervene); *see also* Greenwood, 111 F.3d at 1248-49.  Therefore, Defendants are entitled to summary judgment that they did not have a duty to intervene in this case.

C.  Contractual Duty

In addition to a breach of the duties under Scindia, Plaintiff alleges that Defendant Oldendorff breached its contractual duties to Plaintiff "properly [to] stow and place dunnage in the M/V

GRETA."[29]   Plaintiff points to the charter party agreement between
Cosco Bulk Carrier Co., Ltd., owners of the M/V GRETA, and Armada
(Singapore) Pte., Ltd., whom Oldendorff asserts and Plaintiff does
not dispute is a subcharterer of Oldendorff.[30]   It is true, as
Plaintiff points out, that the Supreme Court in <u>Scindia</u> noted that
it "may also be that the contract between the stevedore and the
shipowner will have provisions specifically bearing on the
dispute."   101 S. Ct. at 1626 n.23.   However, as noted, the
contract upon which Plaintiff relies is a Time Charter between the
owners of the M/V Greta and Oldendorff's subcharterer, *not* between
Oldendorff and the stevedore.[31]   Three circuit courts, including the
Fifth Circuit, have held that a clause in a charter party agreement
nearly identical to the one relied on by Plaintiff "acts as an
indemnification clause between the owner and the time charterer and
does not affect the duties owed to longshoremen."   <u>Robinson v.
Orient Marine Co., Ltd.</u>, 505 F.3d 364, 366 (5th Cir. 2007) (clause
in time charter agreement did not create a new duty for charterer
to protect stevedore from harm from improperly stowed cargo); *see
also* <u>Carpenter v. Universal Star Shipping, S.A.</u>, 924 F.2d 1539,
1545 (9th Cir. 1991) (same); <u>Fernandez v. Chios Shipping Co.</u>, 542

---

[29]  *See* Document 60 at 11.

[30]  *See* Document No. 55, ex. N at OLD-00517 (Time Charter
between Cosco Bulk Carrier Co., Ltd., owners of the M/V GRETA, and
Armada (Singapore) Pte., Ltd.).

[31]  *See* <u>id.</u>, ex. N at OLD-00517.

F.2d 145, 152-53 (2d Cir. 1976).  Accordingly, Plaintiff's claim that Oldendorff owes it a contractual duty properly to stow cargo in the M/V GRETA fails as a matter of law.

## IV.  <u>Order</u>

Accordingly, it is

ORDERED that Defendants' Motions to Strike Affidavit of Captain Joe Grace (Documents No. 61 and 63) are GRANTED, except only for the limited purpose of authenticating Captain Grace's original report; and it is further

ORDERED that Defendants' Motions for Summary Judgment (Documents No. 55 and 56) are both GRANTED, and Plaintiff's claims are DISMISSED on the merits.

The Clerk will enter this Order and send a copy to all counsel of record.

SIGNED at Houston, Texas on this 20th day of October, 2011.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE